**Elgean SHIELD, Appellant,**

**v.**

**The STATE of Texas and Major General Thomas S. Bishop, as Adjutant General of the State of Texas, Appellees.**

**No. 11592.**

Court of Civil Appeals of Texas.

Austin.

May 15, 1968.

Rehearing Denied June 5, 1968.

Richards, Adams, Martin & Stout, Charles W. Richards, Austin, for appellant.

Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., A. J. Carubbi, Jr., Executive Asst. Atty. Gen., J. C. Davis and John H. Banks, Asst. Attys. Gen., Austin, for appellees.

O'QUINN, Justice.

Elgean Shield, who was retired in 1946 upon a disability discharge from the Army of the United States, brought this suit in May, 1965, seeking to compel the Adjutant General of Texas to change Texas National Guard records with respect to Shield's length of service.

Shield is now drawing retirement pay in amounts based in part upon the length of his service in the Texas National Guard. The changes sought by him, if made as demanded, would entitle Shield to increased retirement pay.

The cause was heard before the district court without intervention of a jury. The trial court found that Shield was not entitled to the relief he sought and entered judgment denying any and all relief. Shield has perfected his appeal from this judgment.

We affirm the judgment of the trial court.

Shield is presently receiving 100 percent disability pay amounting to three-fourths of base pay of a major, with longevity computed on service for 19 years, 11 months, and five days. If the changes sought were made, Shield would be entitled to retired pay as a lieutenant colonel with service for 23 years and five months.

The records questioned by Shield, which he seeks to have revised, show (1) that he had a short period of service in the Texas National Guard from July 14, 1923, to August 27, 1923, in a company stationed at Bangs, Texas; and (2) that his service was not renewed until shortly before he was commissioned a second lieutenant in a company at Coleman, Texas, effective in February, 1926.

Shield contends that he was not discharged in August, 1923, and that his service in the Texas National Guard was continuous from the initial enlistment July 14, 1923, until his unit was inducted into federal service in December, 1941, following the attack on Pearl Harbor.

Appellant Shield assigns eleven points of error. The State answers with four counterpoints. Shield's contentions mainly are (1) that it was error not to order the adjutant general to perform the ministerial act of changing the records, or, if the act of changing the records was discretionary, then it was error not to hold the adjutant general abused his discretion in not making the change; (2) that the claim of laches made by the State was not available to it; and (3) that there was no evidence and insufficient evidence to support the judgment, or the judgment was against the overwhelming weight of the evidence.

Elgean Shield in July, 1923, enlisted in the Texas National Guard and went to summer camp with a unit from Bangs, Texas, commanded by his brother-in-law, Karl E. Wallace. Shield was appointed second lieutenant by Wallace who promised he would try to get the colonel in command at camp to commission Shield. The colonel refused to approve Shield's commission, and, according to Wallace, "they had to bust him back as sergeant in camp." Shield was disappointed, as was Wallace. To clear his unit rolls after camp, Wallace testified that he discharged Shield with a customary notation of "change of station," meaning removal to another place of residence.

Shield had earlier completed two years at Texas A. and M. College, where he

was enrolled in the Reserve Officers Training Corps. After the summer of 1922, Shield did not return to Texas A. and M., but went to Princeton University a short time before returning to Texas, where he enrolled in September at the University of Texas in Austin. Shield attended the University of Texas for three years from 1922 to 1925.

In the summer of 1925 Wallace was told by his colonel at annual camp that the Bangs company was being transferred to Coleman. The colonel told Wallace to "get busy and reorganize" the company. It was Wallace's purpose, as company commander, to select a man named Snodgrass as first lieutenant and again to appoint Shield a second lieutenant. Shield helped in organizing the company in the fall of 1925, as did an officer named Jones, acting in the nature of a recruiting officer.

Wallace testified that, " * * * at that time there come a new ruling that an officer, unless he had prior service in World War I, had to be an enlisted man for three years or had to be transferred from the ROTC with a commission." Shield did not qualify as an officer under this ruling.

Official records of the National Guard, shown to Wallace and introduced into evidence, indicated that Shield had been discharged as an enlisted man in November, 1925, to accept a commission as an officer effective in February, 1926.

Wallace testified that Jones had told him that Jones would "do a little shenanigans" to make Shield eligible on paper to accept the commission. It was Wallace's testimony that Jones " * * * was a close friend of Elgean's, and mine, too, and he said,—I didn't know what shenanigans he performed, but seeing that [the records] I know what happened. He went out there and put another record in there in order to get him qualified."

This testimony continued as follows:

"Q In order to get him qualified whereby he could receive a commission?

A That's right.

Q In the National Guard?

A I don't know how he did it, but some shenanigan, he said. That's all he told me, but that couldn't be anything else but that."

Shield denied at the trial that he had been discharged in August, 1923, and insisted, as already observed, that his service was continuous in the Texas National Guard from July 14 without interruption until his unit entered federal service in December, 1941, following the attack on Pearl Harbor.

Wallace, who retired as a colonel from the army in 1956 after serving from 1917, testified that Shield was discharged from the Bangs company in August, 1923, and did not again become active until the fall of 1925 when Wallace asked Shield to help reorganize the company at Coleman. This testimony is corroborated by the official records in evidence.

The official records indicate, and Colonel Wallace testified, that Shield attended annual encampment in the summer of 1923 for which he drew pay. The records show that Shield did not again draw pay from the National Guard until March, 1926, following effective date of his commission in February of that year.

Shield testified that he attended drills at Bangs, where he claims he was still a member of the unit, and also attended drills in Austin, where he was attending the University of Texas. Wallace testified that Shield did not attend any drills at Bangs following his discharge August 27, 1923. The official records support the testimony Wallace gave on the matter.

Shield testified that he "lived with Carl Phinney and John Mayfield" in Austin, where Phinney commanded a quartermaster unit at Camp Mabry. "Every time Carl would go to drill," Shield swore,

"I would go with him." Shield did not claim to be officially enrolled in Phinney's unit in Austin, but testified that he voluntarily went to drills without pay just to help out.

Shield testified that he attended drills without pay because he "was a fairly well fixed young man" and that "the money was just not sufficient for me to worry about asking for a transfer" from the Bangs unit to Phinney's unit in Austin.

Further testimony on this subject was given by Shield as follows:

"A [Shield] The money was of no importance to me.

Q [Counsel] Well, did you ever receive any money from the National Guard?

A Oh, yes.

Q All right; when did it commence?

A I got my first pay in Camp from the 14th of July to August 27th, 1923, and which I was paid in cash over the table. My next pay check that I got from the National Guard was in March of 1926 when I got paid for three or four drills. Then my next pay check period was May and June of 1926, when I drew full pay as a Second Lieutenant, for the full amount of drills allowed.

Q Yes, sir.

A From then on I never ceased—from that time until to date I have never failed to receive a check from the United States Government.

THE COURT: Was the testimony there that the first pay you ever received covered the period from July 14th, 1923, to August 27, 1923?

A Yes, sir.

THE COURT: And you never asked any questions about why it stopped there?

A No, I didn't ask any question, because I didn't attend any drills for pay.

THE COURT: Excuse me; go ahead.

Q In other words, your testimony then is that you attended—you would go out to where they were drilling, but you didn't attend it for pay?

A No, sir, I didn't.

Q Is that your testimony?

A Yes, sir.

Q And over what period of time did that extend?

A From August 27, 1923, until February 12, 1926.

Q In February of ——

A 1926.

Q February, 1926?

A Yes, that's right.

Q All right, sir. Did your financial status change at that time whereby that you needed the money, or what?

A No. The fact that I was Federally recognized as a Second Lieutenant, and I was a certifying officer on the payroll for the enlisted men of Company B, 142nd Infantry. If I had said I didn't want to draw pay, I would have been swearing a lie. I had to certify to those payrolls, from February 1926 until I was inducted in the Service on Pearl Harbor Day. I certified to every payroll."

Shield testified that he started "trying to get my records straight" in 1947. At that time he was in receipt of a final statement from the army finance office and a notice from the adjutant general of Texas advising that Shield's "length of service had been dated from February 21, 1926," the date of his commission as a second lieutenant.

Records of the adjutant general show that in 1949 Shield wrote at least two letters requesting a change of his records. It was in 1949, Shield testified, that he was given options under federal law, one of which was to accept the years of service reflected by the records, or " * * * to protest and have a new analysis of our longevity made by the finance department of the United States Army." The record does not reflect which option Shield chose, but his testimony was that in 1949, he "sent letter after letter, boxes full of them." It is not clear whether the letters were to the finance department or to the adjutant general of Texas.

Under the statutes of this State the adjutant general is in control of the military department, subordinate only to the governor in such matters, and has custody and charge of all books, records and papers in that department. (Article 5790, Vernon's Ann.Civ.Sts.). Under Article 5781 the Governor prescribes "such regulations as he may see fit for the organization of the Texas National Guard." The adjutant general prescribes "regulations not inconsistent with law for the government of his department and the custody, use and preservaiton of records and property * *." (Article 5793).

In handling requests for change of records, the adjutant general follows a standard procedure. The claimant is required to supply, in addition to his statement, the corroboration of three witnesses able to verify the factual matters. The request for change is referred to the adjutant general and then by him to the "board of corrections of military records."

The record does not disclose that Shield attempted to meet the requirement to supply three verifying witnesses. It was shown that beginning in 1962 Shield conferred with personnel of the adjutant general's office on at least ten occasions. The present adjutant general, Major General Thomas S. Bishop, instructed Mr. Raymond Whitaker, a chief warrant officer assigned to the adjutant general's department as the assistant adjutant, "to stay with him [Shield] and help him all [Whitaker] could in obtaining any information" that could be found in the department and to furnish Shield with copies "as he requested them." Mr. Whitaker testified he complied with these orders.

In addition, General Bishop sent Mr. Whitaker to Brownwood, Coleman, Santa Anna and Bangs to interview persons shown by official records to have been in the Texas National Guard during the years 1923 to 1926 in an effort to "contact anyone personally to verify" that Shield was in the service during that period. Mr. Whitaker testified that he was not able to find any witness able to support the claim of service made by Shield. In Coleman, where the reorganized company was stationed, Mr. Whitaker found an officer who was in the company with Shield, a former first sergeant of the company, and "some of the privates who served under" Shield. None of the persons interviewed in Coleman or elsewhere was able to supply the supporting statement needed to comply with the rule under which claims were referred to the "board of corrections."

At the trial of this cause Shield testified that he attended drills with several persons he named. The only person named by Shield who testified in this case was his brother-in-law, Colonel Wallace. It was Colonel Wallace's testimony that during the period from August, 1923, when Shield was discharged, until late in 1925, when the Bangs company was reorganized at Coleman, Shield did not attend any drills.

When told that Shield said that "he came up from Austin frequently and acted as close order drill instructor" at Bangs, Colonel Wallace replied, "No, he did not." When told that Shield claimed he attended drills at Bangs on such occasions "wearing the uniform he received in the ROTC at Texas A. & M.," Colonel Wallace said, "He did not. I told him so. I can't swear to that because I know better."

Colonel Wallace testified that he himself went to drills of the Bangs company, of which he was the commanding officer, and went to the summer camps, and that Shield did not attend either the home station drills or the summer camps. Instead, Colonel Wallace testified, Shield "went to school" at the University of Texas. Shield admitted on appeal that he did not attend summer camp in 1924. As already noted, Shield was three years at the University of Texas in Austin from 1922 to 1925.

The National Guard Register for the year 1927, published by authority of the Secretary of War by the United States Printing Office, was exhibited at the trial during cross examination of Shield. The State introduced into evidence that portion of the register showing Shield's record of service in the Texas National Guard as of 1927. After setting out Shield's name, rank, and date of birth, the register stated his service in full as "Pvt sgt Inf 14 July 23 to 27 Aug pvt Inf 31 Oct 25 to 20 Nov 25/ 2Lt Inf 25 Feb 26."

Shield's "service record" as of November 20, 1925, was introduced showing an enlistment from October 31, 1925, to November 20, when he was separated from the service "by reason of discharge to accept commission." This record is in harmony with the record of Shield's "second enlistment" which Colonel Wallace testified was handled by Jones in which Jones worked "a shenanigan" to make Shield eligible for a commission.

Both Shield and Colonel Wallace testified that the "Elgean Shield" signature on the "second enlistment" was not Shield's signature, that his name was misspelled, and personal data as to birth and marital status were inaccurate. Colonel Wallace testified regarding this enlistment record, "All I can say is he [Jones] called me and said he took some shenanigans, and seeing that [the second enlistment record] I assume he did. I can say it's not Elgean's signature."

Colonel Wallace's testimony that Jones "took some shenanigans" to produce a "second enlistment" record to make Shield eligible for a commission is neither explained nor clearly contradicted by Shield.

At the trial Shield was asked, "Do you know what dates that this is talking about [Wallace's statement of the eligibility rule as it affected Shield], whether or not to be three years service was effective at that time?"

Shield answered, "Yes, sir. That was brought up and discussed at the [unit] adjutant general's office and discussed at other places, with the view of putting me in as a second lieutenant, and it was decided they would have to VOCO[1] me sometime during the year of 1924, so as to make my continuous—my enlistment from 1923 continuous, or else I couldn't be in the Guard."

We find no other testimony explaining how Shield qualified for a commission in the face of the rule in effect at the time that a man could not qualify as an officer "unless he had prior service in World War I," had been "an enlisted man for three years, or had been transferred from the ROTC with a commission."

The relief sought by Shield is the writ of mandamus to compel the adjutant general of Texas to change official military records in his custody. Unless the performance of this act by the adjutant general is one clearly defined and enjoined by law, and is, therefore, ministerial in its nature, neither involving discretion nor leaving an alternative, the writ will not issue against this public officer. Heaton v. Bristol, 317 S.W.2d 86 (Tex.Civ.App., Waco, writ ref.), cert. den. 359 U.S. 230, 79 S.Ct. 802, 3 L. Ed.2d 765; reh. den. 359 U.S. 999, 79 S.Ct. 1123, 3 L.Ed.2d 987.

The standing operating procedure, adopted and used in the adjutant general's department when requests are made by an individual for correction of a personal record, prescribes that the request be sup-

1. VOCO means "Verbal Order of Commanding Officer".

ported by the verification of three other persons. Upon compliance with this requirement, the request is referred to the adjutant general and the board of corrections of military records for decision.

■ To make a change or correction in military records for any individual, therefore, requires discretion of the adjutant general and the board of corrections. We find nothing in the record showing that correction or change of individual military records is clearly defined or enjoined by law in the absence of proper verification. We think the procedure in use is calculated to insure fair and orderly consideration of any individual request for a change. Any change thereafter made results from exercise of discretion and is not a mere ministerial act required by law to be performed upon the naked request of an interested individual.

There is no showing that Shield complied, or attempted to comply, with the prescribed procedure. This remedy was available to Shield and if followed by him should have been adequate and effective. We think in the absence of a reasonable effort to pursue the remedy available in the department, Shield has failed to show he is entitled to writ of mandamus. Arnold v. City of Sherman, 244 S.W.2d 880 (Tex.Civ. App., Dallas, writ ref.).

Although Shield contends that his discharge of August 27, 1923, on the basis of change of residence, was, if made, contrary to law and therefore void, he admitted at the trial that it was the usual procedure followed at that time and one he himself pursued during 17 years he was a company commander. Colonel Wallace testified that if "change of station" had not been used as the recorded basis for discharging an enlisted man who did not attend drills, the only alternative was to have the men apprehended and tried by court martial. To follow the alternative course, Colonel Wallace testified, would "kill the company right there."

"If it got out that you were going to arrest a guy," Colonel Wallace said, "and try him because he didn't attend drills, you might as well close your company down because nobody would join."

Shield testified that his practice was to keep a man on the rolls one month after he quit attending drills and then discharge the man, "V. O. C. O. Verbal orders of commanding officer."

We think it clear from the evidence that Shield did not fulfill the terms of his enlistment in the Texas National Guard beginning in 1923, and that after he was commissioned as an officer in 1926, he discharged enlisted men by the same method under which he had been discharged by Colonel Wallace on August 27, 1923.

Records of the adjutant general show that Elgean Shield enlisted July 14, 1923, in Company B, 142nd Infantry, at Bangs, and was discharged from the same organization August 27, 1923. The payroll records do not reflect that Shield was carried on the payroll of Company B as an enlisted man after his discharge August 27, 1923. Colonel Wallace, the company commander at that time, testified that Shield did not attend any drills or summer camps as an enlisted man after the discharge in 1923. Colonel Wallace testified he had promised Shield he would get him a commission at camp in the summer of 1923 and when this failed, Shield was unwilling to continue serving as an enlisted man. Asked about the drills Shield attended after August, 1923, Colonel Wallace stated, "He didn't attend any of them. Of course, he was a little embarrassed, and so was I."

Official records of the adjutant general reflect that Shield enlisted in Company B, 142nd Infantry at Coleman under date October 31, 1925, and was discharged from the organization under date November 20, 1925, to accept a commission in the Texas National Guard. The commission as second lieutenant became effective February 21, 1926.

The only other material records before this Court are records made by appellant and introduced into the record.

The trial court correctly denied the relief Shield sought, and the court did not abuse its discretion in denying the writ of mandamus.

The records of enlistment and discharge that Shield seeks to have changed or corrected are records made in the years 1923, 1924, and 1925. Shield contends the records should be changed now by mandamus compelling the adjutant general to reform the several entries affecting Shield's length of service in order that he can obtain increased retirement pay.

Retirement pay, like active duty pay, is based on longevity, or years of service, and the grade of the individual. When Shield found in 1947 that his pay had been changed by the army finance office, he knew, or, as an experienced officer in the military, should have known, that some entry in his official records reflected a length of service something less than the service upon which he had been receiving pay.

Yet by his own admission Shield did not seek to bring suit from 1947, when he learned his official record required a reduction in pay, until after 1963, when he went to the legislature for permission to sue. (H.C.R. 48, 58th Leg., Reg.Sess., approved May 30, 1963). After delay of 16 years, Shield obtained the right to sue and then waited an additional year before filing suit. The records he sought to have corrected were made about 40 years before he made his claim in court.

■ Under the rule of Callahan v. Giles, 137 Tex. 571, 155 S.W.2d 793, writ of mandamus will not be granted in aid of one who is guilty of laches, a defense as complete in bar of assertion of an equitable right as the defense of limitation in bar of the assertion of a legal right. 155 S.W. 2d 793, 795, col. 2, 796, col. 1.

In Callahan v. Giles a period of 15 years elapsed during which the claimant was silent and acquiescent. The period of delay in Munson v. Terrell, 101 Tex. 220, 105 S.W. 1114, was 11 years after the action would have been barred if applicable to defendant, and the full period of delay was 15 years. In each of these cases mandamus was sought to compel the commissioner of the general land office to perform an act with reference to records of the office.

■ The record shows that Shield wrote letters in 1947 and 1949, and that he importuned adjutant generals from time to time to change the official files. There is no showing that Shield availed himself of the procedure prescribed by the adjutant general, and it affirmatively appears that he did not until 1963, sixteen years after he first had knowledge of a change in pay, ask authority to assert his claim in court. After a claimant under the facts and circumstances of this case has slept upon his rights for a period of sixteen years, the courts ought not undertake to afford him relief.

The judgment of the trial court is in all things affirmed.

Affirmed.